MISS STELLA RICH, et al. v. TRAVELERS PROTECTIVE ASS'N OF AMERICA.

Middle Section. May 15, 1928.

Petition for Certiorari denied by Supreme Court, November 23, 1928.

Avery Handley, of Nashville, for appellant.
Walter Stokes, of Nashville, for appellee.

OWEN, J. The Travelers Protective Association of America, hereinafter called defendant, has appealed from a judgment rendered in the chancery court of Davidson county, in favor of the complainants. The suit was based upon a $10,000 death benefit certificate, provided the death of the insured was caused by an accident. The defendant issued a certificate to Bernard Rich, who was a brother of the complainants. The complainants are nine in number. The defendant duly excepted to the decree, prayed and was granted an appeal to this court and has assigned five errors.

These errors raise the following propositions:

(1) The Chancellor erred in not dismissing complainant's bill.

(2) The Chancellor erred in holding that the insured's death resulted from injuries effected directly and independently of all other causes, through external, violent and accidental means.

(3) The Chancellor erred in holding that the death of the insured was accidental.

(4) The Chancellor erred in not holding that the insured undertook a hazardous adventure, under the circumstances surrounding his death.

The case was tried before Chancellor John R. Aust, who rendered a written finding of fact in his opinion, which is made a part of this record.

Learned counsel for the complainants state in their brief that the opinion of the Chancellor is so clear, logical and convincing, that for the convenience of each member of the court, it is printed in full as an appendix to their brief.

The opinion of the learned Chancellor is an able one and has cited the facts in a clear and logical manner and he has also cited numerous authorities in support of his opinion, which we have examined and find the principles announced in the various cases cited are applicable to the issues in this case.

The defense made was that the insured's death was not by accident. He lost his life in the Cumberland River, probably twenty miles from Nashville, on July 4, 1925. At the time of his death he was a strong healthy man, about fifty years of age, had not been afflicted with any disease or infirmity which would result in death because of his receiving a thrill or shock.

The record indicates that the deceased was a fairly good swimmer. Just prior to the accident the deceased, in company with some friends, visited a lock and dam on the Cumberland River. The water was flowing somewhat swiftly over the dam and various persons were going over this dam on a surf board. The deceased undertook to go

over. He had seen other parties go over, and come out unharmed. In fact, it appears that this surf board had been used for a number of years and no accident had ever happened prior to July 4, 1925. The deceased got on a board and was pushed off and went over the dam. Shortly after going over and out into the eddy below formed in the river from the water coming over the dam, the deceased was noticed to be sinking, and his body did sink and was not recovered until the next day.

It was the insistence of the Insurance Company that because no water was found in the deceased's lungs that he was not drowned, but his death was caused from heart failure, but if he was drowned, then the deceased assumed such a hazardous risk in going over the falls that the defendant should be relieved from paying the policy.

Without further elaboration we set forth the Chancellor's opinion, which is full, and which makes a full statement of the facts:

"The defendant is a fraternal accident insurance order, and the complainants are the brothers and sisters of Bernard Rich, deceased, and the beneficiaries of an accident policy issued by the defendant to said Rich. Pursuant to its constitution and by-laws the policy obligated the defendant upon the death of said Rich caused by accidental means, as hereinafter more particularly shown, to pay the beneficiaries the sum of $10,000.

"On July 4, 1925, Bernard Rich met his death and complainants' claim is that death was solely and exclusively caused by violent, external and accidental means. Proof of death was made, and a formal demand for payment having been refused by the company, on grounds hereafter to be stated, this suit brought to recover the face of the policy, with interest and statutory penalty.

"There is practically no conflict in the testimony, though there is a sharp controversy over what inferences are to be drawn therefrom as well as the applicable rules of law.

"On July 4, 1925, Mr. Bernard Rich, accompanied by Messrs. Morris Loveman and Merrill Moore and by Misses Jessamine Stein and Stella Rich, repaired to Woodale Grove, a bathing beach on the Cumberland River near Nashville, for the purpose of bathing and swimming. There they met and became associated with Mr. Robert Alexander and wife. Some of the party, including Mr. Rich, entered the water and engaged in the game of 'water hand ball.' During the progress of the game Mr. Rich and the other participants were in the water over their heads and Mr. Rich demonstrated he was a fair swimmer.

"Finding the beach at Woodale filled with a holiday crowd, Mr. Rich and party, now including Alexander and wife, decided to go up the river a short distance to a lock and dam erected and maintained by the United States Government. At this point the water was flowing over the dam at a depth of from eight to ten inches. It first

flowed over the crest of the dam and then down an incline about twenty feet long onto an apron about ten feet wide and some two and one-half feet below the lower edge of the incline. From the apron, which was level, the water flowed into the open river level, about two feet below the edge of the apron. According to the undisputed evidence, this was a favorite place and there were summer pleasure camps in the vicinity near the dam. Messrs. Alexander and Criddle, witnesses for defendant, say, and I so find, that when Rich and party arrived 'A good many of the swimmers were going over the dam, on a kind of board they had there . . . and there were a great number of them going over.'

"The boards mentioned are called 'surf boards' by the witnesses. They were about three feet wide by three and a half feet long, and had a strip or cleat fastened at each end on the top side. The party desiring to ride a board down the incline and into the river would mount it at the top of the dam while others held it, plant his feet against the front cleat and his hands against the rear one, his back toward the board, but so braced by feet and hands that the body would be protected from any jar which might occur when the board left the incline and passed to the apron. This was being done near the shore and just below where the board struck the river there was an eddy through which it was not difficult to swim to the shore. It seems this was a favorite sport at this place for the younger people and had been engaged in for several summers prior to 1925, and has been followed each season since then. Except on the one occasion when Mr. Rich met his death, it does not appear that any person suffered any injury while engaging in this pasttime. The thrill or pleasurable sensation is in riding rather rapidly down the incline, the impact on the water on the apron and from that down to the river level. One witness says it is much like that well understood sport of shooting the chutes.

"Seeing the pleasure experienced by the numbers riding these boards, Mr. Moore and Mr. Loveman, for their first time, rode down the incline and without any mishap or difficulty swam, with their boards, through the eddy to the shore. Mr. Rich thereupon concluded he would experience the same pleasure and mounted a board, in proper position, after having been told just what to do. The board was released and he passed over the incline, onto the apron and into the river. It seems the boards usually turned upside down upon reaching the river, whereupon the rider would catch it and swim with it to the shore. As was usual, when the board struck the river level, Rich temporarily lost hold of it, but quickly regained possession. But for some reason he made no effort to swim to the shore. From his proven ability as a swimmer, I am confident he could have done so if all had been well. Mr. Moore could see his face at this point and this witness says Rich's face was 'expressionless,' 'apathetic.' Witness says

there was a stolid look in his face and that he seemed to be stunned and unconscious. Rich made no movement of hands or feet in an effort to swim, was caught up in the current and carried out into the river. He sank from sight and it was not until the next day his dead body was found.

"At this time Rich was about fifty years of age, robust in appearance and in good health. Dr. Bromberg, who had made physical examinations of Mr. Rich periodically for a number of years, the last of which was not longer than six months before Rich's death, says he was perfectly normal and that he had no disease of any kind. Dr. Bromberg further says he had known Rich for thirty years and had never known him to complain of any disease or physical trouble. There is no witness who testifies to the contrary.

"Dr. Bromberg further gives the names of the diseases that might cause death from excitement, but he says these diseases could not have developed in Mr. Rich between the date of the last physical examination and his death on July 4, 1925.

"The undertaker shows that his examination showed that there was no water in Rich's lungs, but the uncontroverted testimony of Dr. Bromberg is that there is a small per cent of persons who die from drowning that have no water in the lungs. He shows that in such cases a mere spoonful of water will cause a spasm of the glottis and close the entrance into the lungs and yet the person drowns by axphyxiation.

"From these facts, and there are none other, I conclude Rich's death was not brought about by disease, such as heart failure or other physical infirmity existing prior to and at the time of his death.

"The constitution of the defendant provides it shall be liable for injury or death caused by external, violent and accidental means independently of all other causes and shall not be liable when the insured undertakes a hazardous adventure or receives an injury from voluntary or unnecessary exposure to danger or to obvious risk of injury.

"A book of many pages containing the by-laws and constitution is filed in evidence but death from disease, being eliminated, the defendant neither in its answer nor by the oral argument or written brief of its solicitor, has called attention to any other pertinent or applicable provision or exceptions.

"First: Was Rich's death caused by accidental means?

"An injury or death which is the natural and probable sequence of an act or course of action is not produced by accidental means. 1 C. J., p. 429.

"Illustrations of the application of this rule are numerous. Where one is debilitated and while lying in bed raises his hand suddenly and strong blood pressure causes a rupture of the retina. Stone v. Fidelity Co., 133 Tenn., 673; where one has an organic disease and exerts

himself. Shamberg v. Fidelity Co., 158 Fed. 1; where one is in an emaciated and enfeebled condition and is injured from carrying his baggage weighing about eighty pounds. Cobb v. Preferred, etc., Assn., 96 Ga., 818; where one voluntarily has a tooth extracted and blood poison set up in the purposely acerated gum. Ramsey v. Fidelity Co., 143 Tenn., 42.

"But if the injury or death is not the natural and probable consequence of the means which produce it—an effect which does not ordinarily follow and cannot be reasonably anticipated from the means employed, or an effect which was not intended—it is produced by accidental means. 1 C. J., p. 427.

"Illustrations are: Inflammation resulting from the use of a hypodermic needle. Bailey v. Interstate Casualty Co., 40 N. Y., 513; inflammation of the eye caused by splashing water while bathing, Sullivan v. Modern, etc., 167 Mich., 524; a rupture caused by striking a blow with a hammer, Atlanta Acc. Assn. v. Alexander, 104 Ga., 708; injury sustained while exercising by swinging Indian clubs, through an involuntary wrenching of the body, McCarthy v. Travelers Ins. Co., 15 Fed. Cases, No. 8682; involuntary death by drowning, U. S. Mutual Acc. Assn. v. Hubbell, 56 Ohio St. 516, 40 L. R. A. 453; Devan v. Commercial Travelers Assn., 36 N. Y. S. 931.

"Now, as Rich's death was not produced by disease, and as death by drowning or strangulation or impact was not a natural and probable result from riding such a board over the dam by one who could swim as well as Rich, it results that death was accidental and produced by accidental means. From the facts it seems that some unusual and unexpected event took place when Rich struck the river level as there was the visible mark or sign of an 'expressionless,' 'apathetic'' look on Rich's face, indicating unconsciousness, followed by his sinking and drowning by asphyxiation, without any effort to save himself by swimming to the shore.

"I therefore conclude his death was solely produced by external, violent and accidental means.

"Second: Was the act of riding the board over the dam a 'hazardous adventure' or a 'voluntary or unnecessary exposure to danger or obvious risk of injury.'

"It is to be remembered that for some seasons before the event now being considered, this same pastime had been practiced by numbers, that quite a number were engaged in it on the day Rich lost his life, that his associates, Moore and Loveman, with safety made their initial ride over the dam before Rich tried it, that none were injured and that the proof fails to show that any person, either before or since, received an injury from indulging in this sport.

"Defendant's witness Criddle said it looked very easy and the only danger apparent to him was being sucked in when the river

level was reached. But no person was sucked in or under nor did Mr. Rich lose his life in that way.

"The authorities draw a clear distinction between a voluntary act and voluntary exposure, and even though the act be voluntary and there is unknown or unexpected danger, the exposure thereto does not constitute a voluntary one. While actual knowledge may not always be essential, yet it must be so obvious as to impose upon a person of ordinary prudence the duty to know its existence.

"The phrase 'voluntary exposure to unnecessary danger' has often been defined and its proper construction thoroughly settled."

In Corpus Juris, p. 444, it is said:

" 'The words . . . imply a conscious intentional exposure—something of which one is consciously willing to take the risk, the danger being known or apparent, and involve gross or wanton negligence on the part of the insured.—The exception as to injuries resulting from voluntary exposure to unnecessary danger refers only to a danger of a real substantial character, which the insured recognized but to which he nevertheless purposely and consciously exposed himself, intending at the time to assume all the risks of the situation.'

"Our own case of Miller v. Insurance Co., 92 Tenn., is as follows:

" 'We do not think these words the entire equivalent of ordinary negligence. A degree of consciousness of danger is necessary before there would be that voluntary exposure to unnecessary danger required to prevent indemnity.'

"And in Union Gas. Co. v. Harrell, 98 Tenn., 590, it was ruled that where one was shot while advancing on his slayer, with angry and threatening demonstrations, after his slayer had warned him not to approach, did not voluntarily expose himself to unnecessary danger, unless he knew or had sufficient reason to believe his slayer was armed and would shoot to kill if the advance was continued.

"Considering Rich's ability to swim, the numbers who indulged in this sport throughout a course of years, the actual demonstration of its apparent harmlessness in Rich's presence before he made the attempt, and an absence of any proof to show that any other person had been injured, and the burden of proof resting upon the defendant, I am of the opinion Rich's death was not caused by engaging in a 'hazardous adventure' or by voluntary exposure to unnecessary danger,' or 'to obvious risks of injury.' It results that the defendant is liable under the terms of its policy for the principal sum of $10,000.

"But I do not think the complainants should recover the penalty. Such is not recoverable merely because of liability is denied and a suit defended. The refusal to pay must be a bad faith refusal after knowledge of the facts reasonably ascertainable. The company, knew there was no water on the lungs and that water is present in ninety per cent or more of persons who drown. They did not know of the fact that Dr. Bromberg had so recently examined him and would

testify that in his opinion Rich could have had no disease which would produce death from the thrill, excitement or shock incident to riding a board over this dam. The letter of the company to one of the complainants, dated December 4, 1925, in which liability is denied, fairly states the facts as they appeared and of the complainants' duty to furnish proof of death by accidental means as distinguished from disease or other natural causes.

"But complainants are entitled to interest on the principal sum from December 4, 1925, it appearing from correspondence between the parties that proofs had been furnished for some considerable time prior to that date."

John R. Aust, Chancellor.

Counsel for appellant submits the following propositions in support of his assignments of error:

"The burden is always upon the insured or his beneficiaries to show the injury or death resulted from bodily injuries 'effected directly and independently of all other causes, through external, violent and accidental means.'" Travelers Ins. Co. v. McConkey, 127 U. S., 661; 32 L. Ed. 306; 8 Sup. Ct. Rep., 1360.

"A suggestion that death was immediately caused by concussion; as well as that death was caused by axphyxiation; or by spontaneous rupture of an artery-brain hemmorrhage; or heart lesion; or by drowning,—are at most bare conjectures. The burden is upon complainants to show the accidental means directly causing death." Battle Creek Coal Co. v. Martin, 155 Tenn., 34, 290 S. W. 18.

"The courts of this state recognize the rule that under the provisions of such policies as in this case, there is a distinction between 'accidental death' and 'accidental means.'"

"The means might not be accidental, but the result might be."

"A person may do certain acts the result of which acts may produce unforeseen consequences, and may produce what is commonly called accidental death, but the means are exactly what the man intended to use. . . ." Ramsey v. F. & C. Co., 143 Tenn., 42; Morse, Administrator v. Com. Travelers, 212 Mass., 140, 40 L. R. A. (N. S.) 135; Conboy v. Railroad Association, 43 N. E., 1017.

An examination of the authorities cited by learned counsel for appellant will show that they can be distinguished from the instant case in the facts upon which the opinion is based. For instance in Conboy v. Railroad Association, the insured went in seining in swift water and he could not swim. There were step-offs and rough bottom in the bed of the stream.

In Morse, Administrator v. Com. Travelers, supra, the insured was in a canoe out in the water during a high wind. He had been warned of the danger.

In the instant case there is much stress laid upon the insistence that Miss Stella Rich, the sister of the deceased, warned him. She was

some fifteen or twenty feet from the deceased when she requested, not to her brother, but to his companions, not to let him go. On account of the roar that the water was making as it went over the dam, we are of the opinion that deceased never heard his sister's request. He had just seen two parties go over with safety and he wanted to get the same thrill and joy out of the operation of the surf board that his companions had received. It was the 4th of July. The deceased and his friends were on a joyous outing expedition and taking into consideration the surroundings, and the day, a man or a woman could reasonably be expected to undertake some feats that they would not undertake if they were alone, or on a work day, rather than a holiday.

We have carefully considered the record that we have before us. We have read the able briefs presented by counsel representing the litigants. We have read most of the authorities cited. This case was ably argued at the bar by counsel for both parties and after a most careful consideration of the entire record.

We find as a fact that the deceased, Bernard Rich, was drowned in the Cumberland River on July 4, 1925; that his death was produced solely by external, violent and accidental means and that his death was not caused by his engaging voluntarily in a hazardous adventure, and exposing himself to unnecessary danger or obvious risk of injury.

We are of the opinion that there is no error in the judgment of the lower court.

We approve of the opinion of Chancellor Aust and adopt it in this, our opinion, as a part of the opinion of this court.

The assignments of error are overruled, the decree of the lower court is, in all things, affirmed.

The complainants will recover of the defendant and its surety on appeal bond the judgment rendered in the lower court with interest thereon from the date of its rendition and all the costs of the cause for which execution will issue.

Heiskell and Senter, JJ., concur.